In the
United States Court of Appeals
For the Seventh Circuit

No. 97-3253

Dr. Iris I. Varner, et al.,

Plaintiffs-Appellees,

and

United States of America,

Intervening Appellee,

v.

Illinois State University, et al.,

Defendants-Appellants.


Appeal from the United States District Court
for the Central District of Illinois, Peoria Division.
No. 95 C 1355--Michael M. Mihm, Judge.

On Remand from the United States Supreme Court
No. 98-1117


Argued May 31, 2000--Decided September 6, 2000


	Before Flaum, Chief Judge, and Bauer and
Harlington Wood, Jr., Circuit Judges.

	Flaum, Chief Judge.  The plaintiffs comprise a
class of tenured and tenure-track female faculty
members at Illinois State University (the
"University") who contend that the University
pays female professors less money than their male
counterparts. In 1995, the plaintiffs filed suit
seeking both monetary and injunctive relief
against the University and various of its
officers and agents (collectively the
"defendants"), alleging violations of the Equal
Pay Act, 29 U.S.C. sec. 206(d), and Title VII, 42
U.S.C. sec. 2000e et seq. The University, which
the plaintiffs concede is a state entity, moved
to dismiss the Equal Pay Act claim, as well as
the claim for compensatory relief under Title
VII, arguing that the Eleventh Amendment bars
federal jurisdiction over these claims. The
district court denied the defendants' Eleventh
Amendment defense, and the defendants appealed
that decision to this Court under the collateral

order doctrine, see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 145 (1993) (holding that the collateral order doctrine allows for immediate appellate review of the denial of an Eleventh Amendment immunity claim).

In our initial consideration of this case, we affirmed the district court in all respects, finding that Congress clearly intended to abrogate the States' Eleventh Amendment immunity through its passage of the Equal Pay Act, and that this abrogation was a valid exercise of congressional authority under sec. 5 of the Fourteenth Amendment. See Varner v. Illinois St. Univ., 150 F.3d 706, 717 (7th Cir. 1998), vacated, 120 S.Ct. 928 (2000). Although we further determined that Title VII contained an explicit abrogation of the States' Eleventh Amendment immunity, we did not consider whether that abrogation was a valid exercise of congressional authority because we held that the defendants had waived that issue by failing to present it sufficiently to the district court. See id. at 717 n.14. The defendants appealed our rejection of their Eleventh Amendment defense to the United States Supreme Court.

On writ of certiorari to the Supreme Court, our original opinion affirming the district court was vacated and remanded, see Illinois St. Univ. v. Varner, 120 S.Ct. 928 (2000), for further consideration in light of the Court's intervening decision in Kimel v. Florida Bd. of Regents, 120 S.Ct. 631 (2000) (holding that the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 621 et seq., was not a valid abrogation of the States' sovereign immunity). After considering the defendants' assertion of Eleventh Amendment immunity against the backdrop of the Supreme Court's decision in Kimel, it remains our conclusion that the district court properly rejected the defendants' claim of sovereign immunity and denied their motion to dismiss. Consequently, we affirm the decision of the district court.

I.  Analysis

The Eleventh Amendment provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State." U.S. Const. amend. XI. While the Eleventh Amendment appears to restrict only the federal courts' Article III diversity jurisdiction, the Amendment has long been understood "to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms."

Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991). Under the Eleventh Amendment, each State in our federal system remains a sovereign entity and may not be sued by an individual without its consent, see Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996) (citing Hans v. Louisiana, 134 U.S. 1, 13 (1890)).

Although the Eleventh Amendment grants unconsenting States immunity from suit in federal court, that immunity is not absolute. See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 119 S.Ct. 2219, 2223 (1999); see also Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) ("[T]he Eleventh Amendment, and the principles of state sovereignty which it embodies, . . . are necessarily limited by the enforcement provisions of sec. 5 of the Fourteenth Amendment."). Congress may constitutionally abrogate the States' Eleventh Amendment immunity if two criteria are satisfied: (1) Congress must unequivocally express its intent to abrogate the States' sovereign immunity; and (2) in abrogating that immunity, Congress must act pursuant to a valid exercise of power. See Seminole Tribe, 517 U.S. at 55. Because the defendants no longer contest Congress' intent to abrogate the States' Eleventh Amendment immunity in this case, we need only consider the question of whether the abrogations of sovereign immunity contained in the statutes at issue are valid exercises of congressional power under sec. 5 of the Fourteenth Amendment./1

In City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court explained that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." Id. at 518; see also Kimel, 120 S.Ct. at 644 ("Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."). At the same time, the City of Boerne decision made clear that this affirmative grant of congressional power is limited to "enforcing" the Amendment's restrictions on the States and does not extend to determining what constitutes a constitutional violation. City of Boerne, 521 U.S. at 519. Recognizing that Congress must have latitude in determining where the line lies between appropriate remedial legislation and a substantive redefinition of a constitutional right, the Court held that "[t]here must be a

congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. at 520.

Because the requirements of congruence and proportionality mark the boundaries of Congress' Fourteenth Amendment enforcement power, and because Congress lacks the power to abrogate the States' sovereign immunity under Article I of the Constitution,/2 see Seminole Tribe, 517 U.S. at 72-73, congressional legislation that creates a cause of action against the States must satisfy the congruence and proportionality test. In Kimel, 120 S.Ct. 631, the Supreme Court used the congruence and proportionality test to determine whether the ADEA validly abrogated the States' sovereign immunity. The ADEA makes it unlawful for an employer, including a State, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age," 29 U.S.C. sec. 623(a)(1). The Kimel Court held that, although the ADEA contained a clear statement of Congress' intent to abrogate the States' Eleventh Amendment immunity, that abrogation exceeded Congress' Fourteenth Amendment enforcement power. Kimel, 120 S.Ct. at 640-50.

Applying the congruence and proportionality test, the Kimel Court relied on a number of factors in concluding that Congress exceeded its authority in creating an individual cause of action for money damages against the States under the ADEA. Because age is not a suspect classification under the Equal Protection Clause, States may discriminate on the basis of age without offending the Fourteenth Amendment if the challenged age classification is rationally related to a legitimate state interest. The Court found that the ADEA, "through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable [constitutional] standard." Id. at 647. Furthermore, the Court found little in the ADEA's legislative record to confirm that age discrimination by the States was a widespread problem that demanded a strong remedy. See id. at 648-49. "In light of the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States," the Court held that the ADEA's abrogation of the States' Eleventh Amendment immunity was not a valid exercise of Congress' enforcement power under sec. 5 of the Fourteenth Amendment. Id. at 650.

This Court has recently applied the congruence and proportionality test in the context of

individual suits against the States under the Americans With Disabilities Act ("ADA"), 42 U.S.C. sec. 12111 et seq. In Erickson v. Board of Governors of State Colleges and Universities for Northeastern Ill. Univ., 207 F.3d 945 (7th Cir. 2000), we held that Title I of the ADA, 42 U.S.C. sec.sec. 12111-12117, which prohibits discrimination in employment based on disability and requires employers to reasonably accommodate disabled individuals, was an invalid exercise of congressional authority under sec. 5 of the Fourteenth Amendment. See also Stevens v. Illinois Dep't of Transp., 210 F.3d 732 (7th Cir. 2000). In reaching this conclusion, we determined that "the disparate-impact and mandatory-accommodation rules found in the ADA" far exceeded the constitutional protections provided by the Equal Protection Clause. Erickson, 207 F.3d at 951; see also Stevens, 210 F.3d at 738. Furthermore, we concluded that these provisions could not be sustained as "reasonable prophylactic legislation." Erickson, 207 F.3d at 951-52; see also Stevens, 210 F.3d at 740-41. Underlying this holding was our understanding that Congress could not subject disability discrimination, which receives only rational basis review under the Constitution, see Cleburne v. Cleburne Living Center, 473 U.S. 432, 442-46 (1985), to more searching scrutiny. See Erickson, 207 F.3d at 951 (holding that the ADA "exceed[s] the sec. 5 power . . . at least to the extent it extends beyond remedies for irrational discrimination"). In light of these principles drawn from prior precedent, we now review the defendants' challenge to the validity of Congress' abrogation of the States' Eleventh Amendment immunity in the Equal Pay Act de novo, see EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1279 (7th Cir. 1995) (stating that pure claims of law are reviewed de novo).

A.  The Equal Pay Act

The Equal Pay Act prohibits discrimination in wages based on gender./3 In order to prevail on an Equal Pay Act claim, an employee must first demonstrate unequal pay for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. sec. 206(d)(1); see Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Once an employee has met her burden of showing unequal pay for equal work, an employer may avoid liability under the Act by proving that the wage disparity exists "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. sec. 206

(d)(1); see Corning Glass, 417 U.S. at 196. In effect, the provisions of the Equal Pay Act establish a rebuttable presumption of sex discrimination such that once an employee has demonstrated that an employer pays members of one sex more than members of the opposite sex, the burden shifts to the employer to offer a gender-neutral justification for that wage differential. See id. at 196; Fallon v. Illinois, 882 F.2d 1206, 1211 (7th Cir. 1989).

Because a prima facie case under the Equal Pay Act requires only an initial showing of a wage differential between the sexes, the Act's remedial provisions do not perfectly mirror the Constitution's prohibition on gender discrimination. Under the Equal Pay Act, an employer is potentially subject to liability without a showing of discriminatory intent. See Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998) ("The E[qual] P[ay] A[ct] does not require proof of discriminatory intent."); see also Berry v. Board of Supervisors of LSU, 715 F.2d 971, 975 (5th Cir. 1983) (holding that the mere allegation that a female professor was paid less than a male colleague for equal work stated a claim under the Equal Pay Act). In contrast, in order to make out a claim of gender discrimination under the Constitution, an individual must demonstrate an intent to discriminate on the part of the employer. See Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 274 (1979) (stating that it is "purposeful [gender] discrimination . . . that offends the Constitution") (internal quotation omitted); Washington v. Davis, 426 U.S. 229, 238-39 (1976). Because the Equal Pay Act allows a finding of gender discrimination absent a showing of discriminatory intent, while the Constitution does not, the effect of the Equal Pay Act's burden-shifting remedial scheme is to prohibit at least some conduct that is constitutional.

The plaintiffs concede that the Equal Pay Act does not preclude the possibility that an employer will be held liable for conduct that is not prohibited by the Constitution. However, as the plaintiffs note, the Supreme Court has made clear that the mere fact that a statute's remedial regime is broader in scope than the constitutional prohibitions against discrimination does not mean that the statute is not a proportional and congruent response to that problem. See Kimel, 120 S.Ct. at 644 ("Congress' sec. 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment."); City of Boerne, 521 U.S. at 518. Section 5 of the Fourteenth Amendment is a remedial provision, and Congress has both the power and the discretion to

enforce its guarantees through prohibitions broader than those contained in the Constitution. See Kimel, 120 S.Ct. at 644. Furthermore, because "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, . . . Congress must have wide latitude in determining where it lies." City of Boerne, 521 U.S. at 519-20; see also Kimel, 120 S.Ct. at 644 ("[T]he determination whether purportedly prophylactic legislation constitutes appropriate remedial legislation, or instead effects a substantive redefinition of the Fourteenth Amendment right at issue, is often difficult."); Katzenbach v. Morgan, 384 U.S. 641, 651 (1966) ("Correctly viewed, sec. 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."). The question before us, therefore, is not whether the remedial provisions of the Equal Pay Act prohibit some constitutional conduct. Instead, we must consider whether the Act can be characterized as a proportional and congruent response to the problem of unconstitutional wage discrimination based on gender.

The defendants contend that the burden-shifting effect of the Equal Pay Act renders it an invalid exercise of congressional authority under sec. 5 of the Fourteenth Amendment because, like the ADEA, it is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." City of Boerne, 521 U.S. at 532. However, unlike the ADEA, which "impose[d] substantially higher burdens on state employers" than the Constitution, Kimel, 120 S.Ct. at 648, the remedial regime of the Equal Pay Act is less indiscriminate in scope than the ADEA. In passing the Equal Pay Act, Congress did not prohibit all wage practices that result in a disparate impact upon the sexes, nor did it provide for liability upon a mere showing of unequal pay. See EEOC v. Francis W. Parker Sch., 41 F.3d 1073, 1077 (7th Cir. 1994) (stating that the Equal Pay Act "has been construed to preclude disparate impact claims") (citing County of Wash. v. Gunther, 452 U.S. 161, 170-71 (1981)); see also Marshall v. City of Sheboygan, 577 F.2d 1, 4 (7th Cir. 1978) (stating that Congress' purpose in enacting the Equal Pay Act was not to prohibit all disparities in pay between men and women, but rather to "eliminate 'discrimination on account of sex in the payment of wages.'") (quoting Preamble, Equal Pay Act, Pub. L. No. 88-38, 77 Stat. 56). Rather, an examination of the purpose of the Equal Pay

Act, and an evaluation of its remedial scheme, demonstrate that the Act is targeted at the same kind of discrimination forbidden by the Constitution.

In comparing the provisions of the ADEA disapproved in Kimel, and the remedial scheme of the Equal Pay Act, perhaps the most significant difference between the two statutes is in the exemptions from liability provided to employers once a prima facie case of discrimination has been made. In Kimel, the Supreme Court stated that, despite the narrowly-construed "bona fide occupational qualification" defense from liability under the ADEA, "the Act's substantive requirements nevertheless remain at a level akin to our heightened scrutiny cases under the Equal Protection Clause." Kimel, 120 S.Ct. at 648. In contrast, by providing a broad exemption from liability under the Equal Pay Act for any employer who can provide a neutral explanation for a disparity in pay, Congress has effectively targeted employers who intentionally discriminate against women. See Gunther, 452 U.S. at 170 (stating that "[t]he fourth affirmative defense of the Equal Pay Act . . . was designed . . . to confine the application of the Act to wage differentials attributable to sex discrimination"); see also Feeney, 442 U.S. at 275 (stating that where an action "could not be plausibly explained on a neutral ground, impact itself would signal that the real classification made . . . was in fact not neutral"). In other words, the broad exemption from liability in the Equal Pay Act for wage differentials based on "any other factor other than sex," 29 U.S.C. sec. 206(d)(iv), indicates that the Act is intended to address the same kind of "purposeful [gender] discrimination," Feeney, 442 U.S. at 274, prohibited by the Constitution.

That the Equal Pay Act is primarily a response to the problem of unconstitutional wage discrimination against women is made clear by a comparison of the Act's remedial provisions with those of several recently invalidated statutes. As we noted in Erickson, one of the central problems with the ADEA identified in Kimel is that "[m]ost age discrimination is rational, and therefore constitutional, yet the Act forbids it." Erickson, 207 F.3d at 948. Having identified this as one of the "principal propositions"of Kimel, id., we then went on to reject individual suits against the States under Title I of the ADA, in part because the disparate impact and mandatory accommodation rules in the statute were too far "outside the boundaries of constitutional discourse." Id. at 951. Prior to Kimel, the Supreme Court used similar reasoning in holding that the Patent and Plant Variety Protection

Remedy Clarification Act ("Patent Remedy Act"), Pub. L. No. 102-560, 106 Stat. 4230 (1992), which authorized damage claims against States for patent infringement, was not a valid exercise of congressional authority under sec. 5. See Florida Prepaid, 119 S.Ct. at 2210-11. According to the Supreme Court, because the Due Process Clause only forbids patent infringement by States when it is intentional and when state tort law does not provide a remedy, the application of the Patent Remedy Act to "[a]n unlimited range of state conduct" was beyond the scope of Congress' powers under sec. 5 of the Fourteenth Amendment. Id. at 2210.

In contrast to the statutes at issue in Kimel, Florida Prepaid, and Erickson, the Equal Pay Act is not aimed at a kind of discrimination (like age or disability) that receives rational basis review. Under the Constitution, gender-based classifications are afforded heightened scrutiny. See J.E.B. v. Alabama, 511 U.S. 127, 136 (1994). Once an individual is able to establish the existence of a gender-based distinction, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." United States v. Virginia, 518 U.S. 515, 531 (1996) (citation omitted); see also Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982) (holding that a gender classification must serve "important governmental objectives" and that "the discriminatory means employed [must be] substantially related to the achievement of those objectives") (internal quotations omitted). In many ways, the requirement that parties show an "exceedingly persuasive justification" for gender-based classifications is more demanding than the Equal Pay Act's provision allowing a party to avoid liability under the statute if they can demonstrate that the established wage disparity is based on something other than sex. Because the Constitution demands an "exceedingly persuasive justification" for gender discrimination, while the Equal Pay Act only requires an employer to offer some legitimate reason for a wage disparity other than sex, in the great majority of cases the Equal Pay Act does not subject employers to liability in situations where the Constitution does not.

The fact that the Equal Pay Act prohibits little constitutional conduct is significant, but the defendants contend that we must also consider the adequacy of the legislative findings supporting the application of the Act to the States. According to the defendants, the legislative findings underlying the Equal Pay Act address only the problem of discrimination in

private industry, and therefore do not justify the application of the Equal Pay Act to public employees. Although we recognize that a review of the legislative record can be an instructive means of distinguishing appropriate remedial action from an impermissible substantive change in legal rights, see id., we want to emphasize that a "lack of support [in the legislative record] is not determinative of the sec. 5 inquiry." Kimel, 120 S.Ct. at 649; see also Florida Prepaid, 119 S.Ct. at 2210; City of Boerne, 521 U.S. at 531-32. This observation is particularly relevant in the context of the Equal Pay Act, where the value of congressional findings is greatly diminished by the fact that the Act prohibits very little constitutional conduct, see City of Boerne, 521 U.S. at 533 (stating that the kind of limitations reflected in the legislative findings inquiry "tend to ensure Congress' means are proportionate to ends legitimate under sec. 5" in circumstances where "a congressional enactment pervasively prohibits constitutional state action") (emphasis added), and where the historical record clearly demonstrates that gender discrimination is a problem that is national in scope.

In considering the validity of congressional action under sec. 5 of the Fourteenth Amendment, "[t]he ultimate question [is] not whether Congress created a sufficient legislative record, but rather whether, given all of the information before the Court, it appears that the statute in question can appropriately be characterized as legitimate remedial legislation." Kilcullen v. New York Dep't of Labor, 205 F.3d 77, 81 (2d Cir. 2000). While it is true that the legislative record of the Equal Pay Act itself is devoid of any explicit findings as to the problem of gender discrimination by the States, see Hundertmark v. State of Fl. Dep't of Transp., 205 F.3d 1272, 1276 (11th Cir. 2000), the defendants do not contest the adequacy of the legislative record regarding wage discrimination outside the public sector. Moreover, by the time the Equal Pay Act was extended to the States, Congress had developed a clear understanding of the problem of gender discrimination on the part of States through its passage of legislation such as the Education Amendments of 1972, Pub. L. No. 92-318, tit. IX, 86 Stat. 373 (1972), and its extension of Title VII to state and local employers in the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, sec. 2, 86 Stat. 103 (1972). See Fullilove v. Klutznick, 448 U.S. 448, 503 (1980) (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in

that area."). We believe that this evidence is sufficient to support the limited action taken by Congress in its passage of the Equal Pay Act, particularly given the well-documented history of gender discrimination in this Nation, a history that is embodied in the Supreme Court's own jurisprudence. See Virginia, 518 U.S. at 531 (stating that "skeptical scrutiny of official action denying rights or opportunities based on sex responds to volumes of history"); J.E.B., 511 U.S. at 136 (stating that "'our Nation has had a long and unfortunate history of sex discrimination.'") (quoting Frontiero v. Richardson, 411 U.S. 677, 684 (1973)); see also Crawford v. Davis, 109 F.3d 1281, 1283 (8th Cir. 1997) (arguing that it would be difficult "to understand how a statute enacted specifically to combat [gender] discrimination could fall outside the authority granted to Congress by sec. 5").

After examining the remedial scheme of the Equal Pay Act and the legislative history surrounding its enactment, we conclude that Congress validly exercised its authority under sec. 5 of the Fourteenth Amendment when it extended the Equal Pay Act to cover wage discrimination on the part of state employers. Our conclusion in this regard is bolstered both by the Supreme Court's own distinction in Kimel between age and gender, see Kimel, 120 S.Ct. at 645 ("Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as 'so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.'") (quoting Cleburne, 473 U.S. at 440), and by our understanding of the purposes of the Equal Pay Act. Congress enacted the Equal Pay Act in an attempt "to remedy . . . the fact that the wage structure of many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." Corning Glass, 417 U.S. at 195 (citation and internal quotation omitted). Significantly, it is precisely these kinds of classifications--those based on outdated and inappropriate assumptions about a woman's place in society--at which the protections of the Fourteenth Amendment are also aimed. Because we conclude that the Equal Pay Act is a piece of "remedial or preventive legislation aimed at securing the protections of the Fourteenth Amendment," Florida Prepaid, 119 S.Ct. at 2207, we hold that the defendants cannot assert the Eleventh Amendment as a defense to the plaintiffs' Equal Pay Act claim./4

B.

The defendants also contend that the district court erred in determining that Congress validly abrogated the States' Eleventh Amendment immunity under sec. 5 of the Fourteenth Amendment when it extended the application of Title VII to the States. In our original consideration of this claim on direct appeal, we noted that this Court has already held the extension of Title VII to state employers to be a valid exercise of Congress' sec. 5 authority. See Liberles v. County of Cook, 709 F.2d 1122, 1135 (7th Cir. 1983); United States v. City of Chicago, 573 F.2d 416, 423 (7th Cir. 1978) (holding that Congress' extension of Title VII's protections to public employees was "clearly rationally related to and consistent with 'the letter and spirit' of the Fourteenth Amendment"). We then held that the defendants had waived this argument, and consequently any challenge to our existing precedent, by failing to adequately develop it before the district court. See Varner, 150 F.3d at 717 n.14 (quoting United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991)) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived (even where those arguments raise constitutional issues)."). Because we do not believe that anything in the Supreme Court's remand order necessitates a new analysis of this question, we again hold that the defendants failed to raise their Title VII claim sufficiently before the district court, and have therefore waived that argument for purposes of appeal.

III. Conclusion

Having found that the extension of the Equal Pay Act to the States was a valid exercise of congressional authority under sec. 5 of the Fourteenth Amendment, and having determined that the defendants waived their sec. 5 challenge to the plaintiffs' Title VII claims, we AFFIRM the decision of the district court.


/1 The defendants no longer dispute that Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity in the Equal Pay Act. Furthermore, the Supreme Court addressed this issue in Kimel when it stated that the enforcement provisions set forth in 29 U.S.C. sec. 216(b), which authorizes private suits to enforce both the ADEA and the Equal Pay Act, "clearly demonstrate Congress' intent to subject the States to suit for money damages at the hands of individual employees." Kimel, 120 S.Ct. at 640. We therefore do not address the defendants' original claim that the Equal Pay Act does not

contain an unmistakable expression of Congress'
intent to abrogate States' Eleventh Amendment
rights.

/2 Although the defendants do not renew their
argument that the Fair Labor Standards Act
("FLSA"), 29 U.S.C. sec. 201 et seq., which
contains the Equal Pay Act, was an invalid
attempt to abrogate the States' sovereign
immunity under the Commerce Clause, we want to
reaffirm our original holding rejecting that
claim. Although Congress explicitly stated that
the FLSA constituted an exercise of congressional
power under the Commerce Clause, see 29 U.S.C.
sec. 202(b), we do not believe that Congress
expressly relied on its Commerce Clause power
when it extended the FLSA, and consequently the
Equal Pay Act, to the States, see Timmer v.
Michigan Dep't of Commerce, 104 F.3d 833, 838-39
n.7 (6th Cir. 1996) ("We believe that th[e]
legislative history [of the Equal Pay Act] falls
far short of constituting an 'express statement'
of congressional intent."), or that any reliance
on its commerce power was intended to be
exclusive, see Mills v. Maine, 118 F.3d 37, 44
(1st Cir. 1997) ("[O]ne cannot read Congress'
statement regarding the [Equal Pay] Act's
validity under the Commerce Clause to indicate
that Congress intended to exclude other
applicable constitutional bases for the Act.")
(quotations and alteration omitted).

Because we remain unconvinced that Congress
clearly expressed an intention to proceed under
its commerce power when it applied the Equal Pay
Act to the States, the key "inquiry is whether
the objectives of the legislation are within
Congress' power under [sec. of the Fourteenth
Amendment]." EEOC v. Elrod, 674 F.2d 601, 608
(7th Cir. 1982). Under this standard, it is not
difficult to conclude that the objectives of the
Equal Pay Act are within Congress' powers under
the Fourteenth Amendment. The purpose of the
Equal Pay Act is to prevent arbitrary gender-
based wage disparities, while prohibiting
"arbitrary, discriminatory government conduct .
. . is the very essence of the guarantee of
'equal protection of the laws' of the Fourteenth
Amendment." Id. at 604. We thus conclude that the
Equal Pay Act's prohibition on discrimination
fits within the objectives of sec. 5 of the
Fourteenth Amendment, and that the Act is an
exercise of congressional power under sec. 5.
This does not mean, however, that Congress'
action in subjecting state employers to the Equal
Pay Act was a valid exercise of its authority
under sec. 5, a subject which is addressed infra.

/3 Although the Equal Pay Act constitutes a separate
act of Congress, it was originally enacted in

1963 as an amendment to the FLSA. In 1974, the Equal Pay Act was applied to the States by virtue of an amendment extending the protections of the FLSA to state employees.

/4 In so holding, we join the other Circuits who have considered this issue in the context of the Equal Pay Act. See Kovacevich v. Kent St. Univ., No. 98-3678, 2000 WL 1205859 (6th Cir. Aug. 25, 2000); Hundertmark v. Florida Dep't of Transp., 205 F.3d 1272 (11th Cir. 2000); O'Sullivan v. Minnesota, 191 F.3d 965 (8th Cir. 1999); Ussery v. Louisiana, 150 F.3d 431 (5th Cir. 1998), cert. dismissed, 526 U.S. 1013 (1999); Timmer v. Michigan Dep't of Commerce, 104 F.3d 833 (6th Cir. 1997); Usery v. Charleston County Sch. Dist., 558 F.2d 1169 (4th Cir. 1977); Usery v. Allegheny County Inst. Dist., 544 F.2d 148 (3d Cir. 1976), cert. denied, 430 U.S. 946 (1977).