In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2435

Kelly Cherry,

Plaintiff-Appellee,

v.

University of Wisconsin System
Board of Regents,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 142--John C. Shabaz, Judge.

Argued January 18, 2001--Decided September 7, 2001

Before Bauer, Manion, and Diane P. Wood,
Circuit Judges.

Manion, Circuit Judge.  Kelly Cherry sued
her former employer, the Board of Regents
of the University of Wisconsin System,
alleging that the Board paid her at a
lower rate of compensation than her male
colleagues because of her sex, in
violation of the Equal Pay Act and Title
IX. The Board moved to dismiss, alleging
that the Eleventh Amendment bars Cherry's
claims. The district court denied the
motion, and the Board appealed. We
affirm.

I.

   Professor Kelly Cherry taught in the
English Department at the University of
Wisconsin-Madison from 1977 to 1999. The
Board of Regents of the University of
Wisconsin System ("the Board") is a State
entity that oversees the University of
Wisconsin-Madison, which is a State
educational institution and recipient of
Title IX funds from the federal
government. Cherry was a tenured
professor at the University of Wisconsin-
Madison until she resigned on August 22,
1999.

   After her resignation, Cherry sued the
Board, alleging that her salary "remained

significantly lower" than that of her male colleagues with similar credentials, and thus, over a number of years, she "was subjected to sex discrimination on the basis of salary" in violation of the Equal Pay Act ("EPA"), 29 U.S.C. sec. 206(d), and Title IX of the Education Amendments of 1972, 20 U.S.C. sec. 1681. Cherry sought compensatory and punitive damages in her Amended Complaint. The Board moved to dismiss Cherry's Amended Complaint, arguing that: (1) Title VII is Cherry's sole avenue for her claims, and thus it precludes her EPA and Title IX claims;/1 (2) Cherry fails to state a Title IX claim; (3) the Eleventh Amendment bars the EPA and Title IX claims; and (4) the Board is immune from any punitive damages award under Title IX. The district court denied the Board's motion, rejecting all of the Board's arguments. The Board appealed.

II.

In this collateral order appeal, the Board reasserts all of the arguments that it raised in its motion to dismiss. Under 28 U.S.C. sec. 1291, we have jurisdiction over appeals from "'final decisions' of the district courts." Furnace v. Board of Trustees of Southern Illinois University, 218 F.3d 666, 669 (7th Cir. 2000) (quoting 28 U.S.C. sec. 1291). A district court's denial of a motion to dismiss is not a final decision. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 829 F.2d 601, 602 (7th Cir. 1987). But the collateral order doctrine is a "narrow exception to the finality rule." In re Moens, 800 F.2d 173, 175 (7th Cir. 1986). It permits an appeal from a non-final judgment if three criteria are met: the order must "(1) 'conclusively determine the disputed question,' (2) 'resolve an important issue completely separate from the merits of the action,' and (3) 'be effectively unreviewable on appeal from a final judgment.'" Midland Asphalt Corp. v. United States, 489 U.S. 794, 799 (1989) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)); see also Furnace, 218 F.3d at 669 n. 2. The third criterion is difficult to satisfy, as the Supreme Court has stressed that the "narrow exception" of the collateral order appeal "is limited to trial orders 'affecting rights that will be irretrievably lost in the absence of an immediate appeal.'" In

re Moens, 800 F.2d at 176 (quoting Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 430-31 (1985)). We must determine whether the Board's claims are immediately appealable without regard to whether a prompt decision by this court will resolve the litigation more quickly. See Digital Equipment Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994).

Because the Eleventh Amendment concerns the Board's privilege not to be sued, which is a privilege that would be irretrievably lost if it were not immediately appealable, the issue of immunity from suit is properly raised in this collateral appeal. Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993); see also id. ("'The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to thecoercive process of judicial tribunals at the instance of private parties.'" (quoting In re Ayers, 123 U.S. 443, 505 (1887))). But the additional (non-immunity) claims asserted by the Board in support of its motion to dismiss (that Cherry failed to state a Title IX claim, and that Title VII precludes Cherry's EPA and Title IX claims) are not immediately appealable because they can be effectively reviewed on appeal from a final judgment. See Lac Courte, 829 F.2d at 602 (a refusal to dismiss a complaint or part thereof is the classic example of a nonfinal order that is not appealable under 28 U.S.C. sec. 1291, either directly or by invoking the collateral order rule). After a later final judgment of the district court, this court may effectively review the issues of whether Title VII precludes Cherry's EPA and Title IX claims, and whether Cherry properly failed to state a Title IX claim. In line with this court's reluctance to exercise pendent appellate jurisdiction over additional issues in a collateral appeal, we decline to exercise such jurisdiction in this case. See United States v. Bloom, 149 F.3d 649, 657 (7th Cir. 1998); see also Swint v. Chambers County Comm'n, 514 U.S. 35, 49-50 (1995) (expressing concern that "a rule loosely allowing pendent appellate jurisdiction" would encourage parties to parlay collateral orders into "multi-issue interlocutory appeal tickets").

We also decline to address the Board's

claim that it is immune from a punitive damages award under Title IX. A claim of immunity to a certain class of damages is "'far removed'" from a claim of immunity from litigation. Burns-Vidlak v. Chandler, 165 F.3d 1257, 1260 (9th Cir. 1999) (quoting Pullman Constr. Indus., Inc. v. United States, 23 F.3d 1166, 1169 (7th Cir. 1994)). "[T]he Supreme Court has made it clear that a potentially 'erroneous ruling on liability may be reviewed effectively on appeal from final judgment.'" Burns-Vidlak, 165 F.3d at 1261 (quoting Swint, 514 U.S. at 43). If punitive damages are permitted to be, and in fact are assessed against the Board, this court can certainly review that issue if it arises from a later final judgment of the district court. In the meantime, the Board's claimed immunity from a punitive damages award will not be irretrievably lost if it is not reviewed in this collateral appeal. See, e.g., Moreno v. Consolidated Rail Corp., 99 F.3d 782, 789-92 (6th Cir. 1996) (en banc) (in affirming a district court's denial of a jury's award of punitive damages to a plaintiff under sec. 504 of the Rehabilitation Act, the Sixth Circuit concluded that sec. 504 does not provide a punitive damages remedy); see also Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 762 (2d Cir. 1998). We thus decline to exercise pendent appellate jurisdiction over this issue. See Crymes v. Dekalb County, Georgia, 923 F.2d 1482, 1485 (11th Cir. 1991) (declining to extend pendent appellate jurisdiction to the "nonfinal" issue of the district court's denial of appellants' motion to dismiss a punitive damages claim).

The remaining issues properly raised in this collateral order appeal are whether the Eleventh Amendment bars Cherry's EPA and Title IX claims. We "review de novo a district court's judgment on whether to dismiss a claim on Eleventh Amendment immunity grounds." MCI Telecommunications Corp. v. Illinois Bell Telephone Co., 222 F.3d 323, 337 (7th Cir. 2000).

The Board argues, however, that pursuant to Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765 (2000), we should avoid the immunity issues and dismiss Cherry's claims "on non-constitutional grounds." In support of its contention, the Board claims that

Title VII precludes Cherry's EPA and Title IX claims, and thus that we should dismiss Cherry's claims on that ground instead of addressing whether the Eleventh Amendment bars Cherry's claims. In Vermont Agency, the Supreme Court determined that when a statute provides no indication that it "permits the cause of action it creates to be asserted against States," it is appropriate for the court to first make that statutory determination before conducting an Eleventh Amendment inquiry. Id. at 779; see Floyd v. Thompson, 227 F.3d 1029, 1035 (7th Cir. 2000). The Court concluded in Vermont Agency that because the False Claims Act ("FCA") provides no indication that States are subject to its penalties, the Court could resolve the case with that statutory determination without considering the issue of immunity. 529 U.S. at 787. But in this case, if it appears "in any way possible" for Cherry to sue the State under the EPA and Title IX, "then Vermont Agency indicates we should resolve the Eleventh Amendment issue first." Floyd, 227 F.3d at 1035.

The Board's argument is unavailing because unlike the FCA, the EPA and Title IX permit suits against the States. See Varner v. Illinois State University, 226 F.3d 927, 930 n. 1 (7th Cir. 2000) (29 U.S.C. sec. 216(b) authorizes private suits against the States to enforce the EPA) (citing Kimel v. Florida Board of Regents, 528 U.S. 62, 73 (2000)); see also 42 U.S.C. sec. 2000d-7(a)(1) (States are not immune from suit under Title IX). Thus, we must resolve the Eleventh Amendment issues raised in this appeal. See Floyd, 227 F.3d at 1035.

A.  The EPA Claim

The Board argues that the Eleventh Amendment bars Cherry's EPA claim. The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. According to the Amendment, non-consenting States may not be sued by private individuals in federal

court. Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356. 121 S.Ct. 955, 962 (2001). But this "immunity from suit is not absolute." College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 670 (1999). The Supreme Court has recognized "that Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" Garrett, 121 S.Ct. at 962 (quoting Kimel, 528 U.S. at 73). The Court has held that the Eleventh Amendment is limited by the enforcement provisions of sec. 5 of the Fourteenth Amendment, and that Congress may subject non-consenting States to suit in federal court pursuant to a valid exercise of its sec. 5 power. Garrett, 121 S.Ct. at 962. Accordingly, the EPA can apply to the States only to the extent that the statute is appropriate sec. 5 legislation. Id.

The Fourteenth Amendment provides, in relevant part:

Section 1.  . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

 . . . .

Section 5.  The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV; Kimel, 528 U.S. at 80. Section 5 grants Congress the power to "enforce the substantive guarantees contained in sec. 1 by enacting 'appropriate legislation.'" Garrett, 121 S.Ct. at 963. Hence, Congress determines what legislation is necessary to secure the guarantees of the Fourteenth Amendment, and "its conclusions are entitled to much deference." City of Boerne v. Flores, 521 U.S. 507, 536 (1997). Pursuant to sec. 5, Congress has the authority to remedy and deter violations of rights guaranteed under the Fourteenth Amendment "'by

prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.'" Garrett, 121 S.Ct. at 963 (quoting Kimel, 528 U.S. at 81).

Nevertheless, the Supreme Court has also recognized that sec. 5 grants Congress the power to enforce the Fourteenth Amendment, not the power "'to determine what constitutes a constitutional violation.'" Kimel, 528 U.S. at 81(quoting City of Boerne, 521 U.S. at 519). It is the responsibility of the Supreme Court, not Congress, to define the substance of constitutional guarantees. Garrett, 121 S.Ct. at 963. In other words, Congress can enact legislation to remedy or prevent conduct that violates the Fourteenth Amendment, but Congress cannot redefine or expand the substance of the Fourteenth Amendment itself. Thus, there must be a "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" Kimel, 528 U.S. at 81 (quoting City of Boerne, 521 U.S. at 520). This means that Congress must carefully tailor its legislation so that it enforces the Fourteenth Amendment without altering the Amendment's meaning. But the Court has acknowledged that because it is "often difficult" to identify whether a statute "constitutes appropriate remedial legislation, or instead effects a substantive redefinition of the Fourteenth Amendment right at issue," Kimel, 528 U.S. at 81, Congress "'must have wide latitude in determining where [that line] lies.'" Id. (quoting City of Boerne, 521 U.S. at 520).

In applying the "congruence and proportionality" test to a federal statute, the Supreme Court has examined the scope of the statute to determine whether it is consistent and compatible with the Fourteenth Amendment, or whether it essentially expands the Amendment by prohibiting more State action than would be unconstitutional. City of Boerne, 521 U.S. at 532; Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 527 U.S. 627, 646-47 (1999); Kimel, 528 U.S. at 86; Garrett, 121 S.Ct. at 963. The Court has also considered whether Congress identified in the legislative record a pattern of unconstitutional conduct by

the States (that was targeted by the statute at issue) in order to determine whether the statute is a proportional response to unconstitutional State action. City of Boerne, 521 U.S. at 530; Florida Prepaid, 527 U.S at 640; see also Kimel, 528 U.S. at 88; Garrett, 121 S.Ct. at 964. But the Court has stated that the lack of support in the legislative record "is not determinative of the sec. 5 inquiry." Kimel, 528 U.S. at 91; Florida Prepaid, 527 U.S at 646; see also City of Boerne, 521 U.S. at 532. Such evidence tends to ensure that Congress' means are appropriate under sec. 5 when the statute in question pervasively prohibits constitutional State action. See City of Boerne, 521 U.S. at 533.

In four recent cases, the Supreme Court has held that Congress exceeded its sec. 5 enforcement powers. In each case, the Court found that the statute in question prohibited substantially more State action than would be unconstitutional. See City of Boerne, 521 U.S. at 532-34 (the restrictions of the Religious Freedom Restoration Act ("RFRA") far exceed any pattern or practice of unconstitutional conduct by the States under the Free Exercise Clause); Florida Prepaid, 527 U.S at 646-47 (under the Patent Remedy Act, an unlimited range of State conduct would expose a State to claims of patent infringement); Kimel, 528 U.S. at 86 (the Age Discrimination in Employment Act ("ADEA") prohibits substantially more state employment decisions and practices than would likely be held unconstitutional); Garrett, 121 S.Ct. at 967 (the Americans with Disabilities Act ("ADA") imposes restrictions that far exceed those of the Fourteenth Amendment's Equal Protection Clause). The Court also concluded in each case that Congress had not identified in the legislative record a pattern of unconstitutional conduct by the States that was targeted by the statutes. See City of Boerne, 521 U.S. at 530 (RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry); Florida Prepaid, 527 U.S. at 640 ("In enacting the Patent Remedy Act, however, Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations."); Kimel, 528 U.S. at 89 ([In enacting the ADEA], "Congress never

identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation."); Garrett, 121 S.Ct. at 966 ("Congress' failure to mention States in its legislative findings addressing discrimination in employment reflects that body's judgment that no pattern of unconstitutional state action had been documented.").

In Varner v. Illinois State University, 150 F.3d 706 (7th Cir. 1998) ("Varner I"), this court affirmed a district court's finding that Congress validly abrogated the States' Eleventh Amendment immunity through its passage of the EPA. On writ of certiorari to the Supreme Court, the Varner I decision was vacated and remanded for further consideration in light of the Court's intervening decision in Kimel, in which the Court held that the ADEA was not a valid exercise of Congress' power under sec. 5 of the Fourteenth Amendment. Kimel, 528 U.S. at 91; Varner v. Illinois State University, 226 F.3d 927, 929 (7th Cir. 2000), cert. denied, 121 S.Ct. 2241 (2001) ("Varner II"). After considering Kimel, this court issued Varner II in which it upheld the holding of Varner I that Congress validly abrogated the States' immunity from EPA claims. Varner II, 226 F.3d at 937.

Subsequent to Varner II, the Supreme Court issued Board of Trustees of the University of Alabama v. Garrett, 121 S.Ct. 955 (2001), in which the Court held that Congress failed to validly abrogate the States' immunity from claims under the ADA./2 In support of the Board's immunity claim, it argues that Garrett conflicts with Varner II, and thus that the Eleventh Amendment bars Cherry's EPA claim.

In Varner II, this court first noted that the Equal Pay Act "prohibits discrimination in wages based on gender," 226 F.3d at 932, and that a plaintiff may establish a prima facie case under the EPA by demonstrating that she received "unequal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Id. (quoting 29 U.S.C. sec. 206(d)(1)). Thus, an employee may establish a prima facie case of gender

discrimination under the EPA without showing discriminatory intent. Varner II, 226 F.3d at 932. In that sense (the court acknowledged in Varner II) the EPA is unlike the Fourteenth Amendment, which requires a showing of the employer's discriminatory intent, and thus the EPA does "not perfectly mirror the Constitution's prohibition on gender discrimination." Id. But the court also noted that once an employee has met her burden of showing unequal pay for equal work, an employer may avoid liability under the Act by proving that the wage disparity exists pursuant to "'a differential based on any other factor other than sex.'" Id. (quoting 29 U.S.C. sec. 206(d)(1)). Because the EPA allows an employer to avoid liability under the Act by proving that the wage disparity in question exists pursuant to "any other factor other than sex," Varner II emphasized that the EPA provides a broad exemption from liability for any employer who can provide a neutral explanation for a disparity in pay. 226 F.3d at 934. Thus, the court concluded that the scope of the EPA is congruent to the Fourteenth Amendment because, like the Fourteenth Amendment, the EPA effectively targets only "employers who intentionally discriminate against women." Id.

The court also stressed in Varner II an important difference between the ADEA and the EPA. The court noted that in Kimel, the Supreme Court recognized that the ADEA targets age-based classifications which, according to the Court's Equal Protection jurisprudence, are subject to the minimal "rational basis review" standard. Varner II, 226 F.3d at 934; Kimel, 528 U.S. at 84. According to that standard, a State may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification is rationally related to a legitimate State interest. Kimel, 528 U.S. at 84. Thus, the Constitution permits States to pursue a broad range of policies that discriminate on the basis of age as long as such policies are reasonably related to a legitimate government purpose. See id. at 83-85. But unlike the ADEA, the EPA targets gender-based classifications which are "afforded heightened scrutiny," which means that they are presumed to be unconstitutional unless the State can demonstrate "an exceedingly persuasive justification" for

them. Varner II, 226 F.3d at 934. As the Supreme Court recognized in Kimel, in comparison with classifications subject to rational basis review, "when a State discriminates on the basis of race or gender, we require a tighter fit between the discriminatory means and the legitimate ends they serve." 528 U.S. at 84. Thus, Varner II recognized that while the ADEA prohibits substantially more State employment practices than those prohibited by the Constitution, the EPA "prohibits very little constitutional conduct." Id. at 935.

The defendants in Varner II argued that because the EPA lacks legislative findings of a pattern of unconstitutional State action, abrogation is not justified. Id. The court acknowledged that although a review of the legislative record can be instructive, a lack of support in the record "is not determinative of the sec. 5 inquiry." Id. (quoting Kimel, 528 U.S. at 91). This, the court noted, is especially true with the EPA, "where the value of congressional findings is greatly diminished by the fact that the Act prohibits very little constitutional conduct," and where "the historical record clearly demonstrates that gender discrimination is a problem that is national in scope." Varner II, 226 F.3d at 935. Thus, while the EPA "is devoid of any explicit findings as to the problem of gender discrimination by the States," id., Varner II emphasized that when the EPA was extended to the States, "Congress had developed a clear understanding of the problem of gender discrimination on the part of States" through its passage of legislation such as Title IX, and through the extension of Title VII to State employers. Id.; see also id. (quoting Fullilove v. Klutznick, 448 U.S. 448, 503 (1980) (Powell, J., concurring) ("'After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area.'")). The court concluded that this evidence, along with the "well-documented history of gender discrimination in this Nation," is sufficient to support the limited action taken by Congress in its passage of the EPA. Varner II, 226 F.3d at 936.

After Varner II, the Supreme Court issued Garrett. 121 S.Ct. 955. In Garrett, the Court first determined whether the scope of the ADA is congruent with the Fourteenth Amendment's Equal Protection Clause. Id. at 963. The Court recognized that disability is a classification that (like age) is subject to "rational-basis review," id. at 963, which means that State policies that involve classifications based on disability are constitutional if there is a rational relationship between the disparity in treatment and some legitimate government purpose. Id. at 964. Thus, the ADA's prohibition of disability discrimination far exceeds what is required under the Fourteenth Amendment. Id. at 966. After determining the "metes and bounds" of the ADA, the Court examined "whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled." Id. at 964. The Court considered a half-dozen examples of disability discrimination in the record, but determined that even if those incidents involved irrational (and thus unconstitutional) action by the States, "these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which sec. 5 legislation must be based." Id. at 965. The Court also reviewed other accounts in the legislative record of adverse treatment by the States. But the Court noted that adverse treatment under the ADA does not necessarily mean irrational treatment that violates the Fourteenth Amendment, and that these accounts were not submitted directly to Congress but to a task force that "made no findings on the subject of state discrimination in employment." Id. at 966. The Court recognized that Congress made no mention of a pattern of unconstitutional behavior by the States in the ADA's legislative findings. Id.

But the Court in Garrett went on to explain that even "were it possible to squeeze out of these examples a pattern of unconstitutional discrimination by the States," such a record would not make the ADA congruent and proportional to the Fourteenth Amendment, precisely because the ADA's requirements far exceed what is constitutionally required. Id. Thus, the Supreme Court concluded that Congress did

not validly abrogate the States' immunity from ADA claims. Id. at 968.

In this case, the Board contends that according to Garrett, "no abrogation of States' immunity against federal statutory claims is valid without express findings in the statute itself, grounded in sufficient legislative record evidence, that States had engaged in a pattern and practice of committing unconstitutional conduct of the type being prohibited by that statute." According to the Board, because the EPA is devoid of any explicit findings of gender discrimination by the States, Congress failed to validly abrogate the States' immunity from the EPA, and thus the Garrett analysis requires us to dismiss Cherry's EPA claim.

The Board's immunity argument is unavailing. There is no indication in Garrett that the Court established a new, bright-line rule that Congress' attempt to abrogate immunity from a federal statute is invalid if the statute lacks specific findings that the States had engaged in a pattern of unconstitutional conduct of the type prohibited by the statute. Garrett does not refute that the "lack of legislative support in the record is not determinative of the sec. 5 inquiry." Kimel, 528 U.S. at 91; see also Florida Prepaid, 527 U.S at 646; City of Boerne, 521 U.S. at 532. All Garrett does is further demonstrate that the legislative record is an important factor when the statute in question pervasively prohibits constitutional State action. See Garrett, 121 S.Ct. at 965-66; City of Boerne, 521 U.S. at 533. Because the ADA's protections extend substantially beyond those of the Fourteenth Amendment, the Garrett Court examined the legislative record for evidence of a pattern of unconstitutional State action that may justify abrogation. Finding no such evidence, the Court determined that abrogation was invalid. But unlike the statutes at issue in City of Boerne, Kimel, Florida Prepaid, and Garrett, all of which pervasively prohibit constitutional State action, the EPA "prohibits very little constitutional conduct." Varner II, 226 F.3d at 935.Precisely because the EPA essentially targets only unconstitutional gender discrimination, the importance ofcongressional findings of

unconstitutional State action is "greatly diminished." Varner II, 226 F.3d at 935. Thus, we decline to overrule this court's decision in Varner II, as the record of gender discrimination identified in that case was sufficient to support the conclusion that Congress validly exercised its authority under sec. 5 of the Fourteenth Amendment when it extended the EPA to cover gender-based wage discrimination on the part of State employers.

B.  The Title IX Claim

The Board also argues that it is immune from Cherry's Title IX claim. According to the Board, even though it is a recipient of federal funds under Title IX, it has not waived its immunity from suits under Title IX by accepting those funds.

Congress enacted Title IX pursuant to its authority under the Spending Clause./3 Davis v. Monroe County Board of Education, 526 U.S. 629, 640 (1999). Title IX provides, with certain exceptions not at issue here, that "'[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Id. at 638 (quoting 20 U.S.C. sec. 1681(a)). Congress enacted Title IX with two principal objectives in mind: "'[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" Gebser v. Lago Vista Independent School District, 524 U.S. 274, 286 (1998) (quoting Cannon v. University of Chicago, 441 U.S. 677, 704 (1979)).

Although Congress can abrogate the States' immunity when it legislates pursuant to the Fourteenth Amendment, Congress cannot override the States' immunity using an Article I power such as Spending Clause legislation. See Garrett, 121 S.Ct. at 962 (citing Seminole Tribe of Florida v. Florida, 517 U.S. 44, 72-73 (1996)). But the Supreme Court has recognized that federal funds under Title IX are "gifts" to the States, College Savings Bank, 527 U.S. at 687. Therefore Congress may, in its exercise of its

spending power, condition its grant of funds to the States on their consent to waive their immunity from suit. See id. at 686; MCI, 222 F.3d at 344; see also Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17 (1981) ("Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States."). According to the Supreme Court, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." Pennhurst, 451 U.S. at 17; Davis, 526 U.S. at 640; see also MCI, 222 F.3d at 344 ("States may waive their immunity by accepting a benefit from Congress that has conditions attached to that acceptance."). Thus, a State may waive its immunity from Title IX suits by accepting federal funds under the statute. MCI, 222 F.3d at 344 (citing College Savings Bank, 527 U.S. at 686- 87).

However, the "mere receipt of federal funds cannot establish that a State has consented to suit in federal court." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 246-47 (1985). Congress must manifest "a clear intent to condition participation in programs funded under [Title IX] on a State's consent to waive its constitutional immunity." Id. at 247. If Congress intends to require the States to waive their immunity from Title IX suits in exchange for their receipt of Title IX funds, Congress "must speak with a clear voice," and do so "unambiguously," in order to "enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Pennhurst, 451 U.S. at 17. Thus, the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." Atascadero, 473 U.S. at 241.

In this case, the Board contends that Congress has not made a clear statement of its intent to condition the State's receipt of Title IX funds on the State's consent to waive its immunity. In support of its contention, the Board argues that because Title IX does not expressly provide for a private cause of action

against the State, Congress has never properly notified the Board that it must surrender its immunity from Title IX suits in exchange for its receipt of Title IX funds.

   The Board's argument fails because Congress has unambiguously conditioned the States' receipt of Title IX funds on their waiver of Eleventh Amendment immunity from private causes of action. Although Title IX does not expressly provide for a private right of action, the Supreme Court has recognized since 1979 an implied private right of action under the statute. Cannon, 441 U.S. at 717; Davis, 526 U.S. at 639. Subsequently in 1986, Congress enacted 42 U.S.C. sec. 2000d-7(a), the Civil Rights Remedies Equalization Act ("CRREA"), which provides in relevant part:

(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972 [20 U.S.C. sec. 1681 et seq.], . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. sec. 2000d-7(a)(1). Congress enacted the CRREA "with full cognizance" of the holding in Cannon that Title IX can be enforced by a private right of action. Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 72 (1992); see also id. (42 U.S.C. sec. 2000d-7 "cannot be read except as a validation of Cannon's holding."); see also Cannon, 441 U.S. at 696-97 ("It is always appropriate to assume that our elected representatives, like other citizens, know the law."). Moreover, the Supreme Court has recognized that Congress carefully crafted the CRREA as "an unambiguous waiver of the States' Eleventh Amendment immunity." Lane v. Pena, 518 U.S. 187, 200 (1996); see also id. at 198 (in enacting the CRREA, "Congress sought to provide the sort of unequivocal waiver that our precedents demand."). And subsequent to the CRREA, the Court established that monetary damages are available to Title IX plaintiffs. Franklin, 503 U.S. at 76; Davis, 526 U.S. at 639. In short, when the Board accepted federal education funds under Title IX, it was clearly put

on notice that it may not discriminate in its programs on the basis of sex, 20 U.S.C. sec. 1681(a); that if it does discriminate on the basis of sex, it may be sued by a private individual, see Davis, 526 U.S. at 639; and that in any such suit, the Board may not assert its Eleventh Amendment immunity, 42 U.S.C. sec. 2000d-7(a). See Litman v. George Mason University, 186 F.3d 544, 553 (4th Cir. 1999). Clearly, the Board was able "to ascertain what is expected of it" in return for Title IX funds. Pennhurst, 451 U.S. at 17. Thus, we agree with the Fourth and Fifth Circuits that by enacting 42 U.S.C. sec. 2000d-7(a), Congress clearly and unambiguously manifested its intent to condition the States' receipt of Title IX funds on their waiver of immunity from suit. See Litman, 186 F.3d at 555; Pederson v. Louisiana State University, 213 F.3d 858, 876 (5th Cir. 2000). In accepting Title IX funding, the Board has waived its immunity from Cherry's Title IX claim.

III.

The Board is not immune from Cherry's EPA claim because Congress validly exercised its authority under sec. 5 of the Fourteenth Amendment when it extended the EPA to cover wage discrimination on the part of State employers like the Board. Nor is the Board immune from Cherry's Title IX claim because Congress clearly and unambiguously manifested its intent to condition the Board's receipt of Title IX funds on its waiver of immunity, and in accepting such funding the Board has effectively waived its immunity from suit under Title IX. Accordingly, we AFFIRM the district court.

FOOTNOTES

/1 Cherry did not assert a claim under Title VII.

/2 Because Garrett was issued after oral argument in this case, we ordered the parties to submit supplemental briefs on the issue of whether Cherry's EPA claim is barred by Wisconsin's Eleventh Amendment immunity in light of Garrett.

/3 The Spending Clause provides in part: "The Congress shall have Power To lay and collect Taxes . . . to . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, sec. 8, cl. 1.