In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3448

NAVREET NANDA,

*Plaintiff-Appellee,*

v.

BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, BELLUR
PRABHAKAR, GERALD MOSS, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4757—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED APRIL 4, 2002—DECIDED SEPTEMBER 17, 2002

Before RIPPLE, KANNE and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Navreet Nanda, Ph.D., brought this discrimination action against her former employer, the Board of Trustees of the University of Illinois, as well as her former supervisors and colleagues at the University (collectively "the University"). The University moved to dismiss Dr. Nanda's complaint, principally on the basis that Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), did not validly abrogate the State's sovereign immunity under the Elev-

enth Amendment. The district court rejected this argument and held that Congress validly abrogated Eleventh Amendment immunity when it extended Title VII to the States. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Dr. Nanda was employed as an assistant professor in the Department of Microbiology at the University's Chicago campus. In July 1998, Bellur Prabhakar, the Chairman of the Department of Microbiology and Immunology, recommended to the University that Dr. Nanda be issued a terminal contract that would end, at its expiration, her employment with the University. The University accepted Dr. Prabhakar's recommendation and issued Dr. Nanda a terminal contract ending on August 31, 1999. Dr. Nanda's efforts to reverse the decision through the University's grievance process were unsuccessful. After exhausting her administrative remedies, Dr. Nanda filed this action in district court.

Dr. Nanda's complaint included three counts. In Count I, Dr. Nanda alleged that she had suffered harassment and that her employment had been terminated on the basis of her sex, race and national origin in violation of Title VII. Count II of Dr. Nanda's complaint set forth a parallel claim under 42 U.S.C. §§ 1983 and 1988 for violations of her equal protection rights and sought injunctive relief, compensatory damages and punitive damages against the University as an institution and also her supervisors for violations of her equal protection rights. Finally, Count

III, a state tort law claim, alleged that Dr. Prabhakar had interfered intentionally with Dr. Nanda's employment relationship with the University.

The University timely moved to dismiss Dr. Nanda's complaint. With respect to Count I, the University maintained that Congress did not abrogate properly the States' sovereign immunity under the Eleventh Amendment when it enacted the Equal Employment Act of 1972 (the "1972 Act") which extended Title VII's coverage to the States. The individual defendants and the University moved to dismiss Count II on the ground that the named administrators were not "persons" within the meaning of 42 U.S.C. § 1983. Finally, Dr. Prabhakar moved to dismiss Count III on the ground that the pleaded state cause of action was preempted by a state statutory cause of action.

In her response, Dr. Nanda submitted that Congress had the authority to extend Title VII to the States pursuant to § 5 of the Fourteenth Amendment. Specifically, Dr. Nanda claimed that Title VII passed the "congruence and proportionality" test articulated in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and its progeny. According to Dr. Nanda, "Title VII does *not* raise the level of scrutiny given to race, national origin and gender classifications beyond that granted in the Equal Protection Clause and, therefore, Title VII is congruent with the Equal Protection Clause." R.58 at 5. Furthermore, Dr. Nanda pointed to the historical problems of race and gender discrimination, and to specific evidence of discrimination against women in institutions of higher education, to establish that Congress' response to the problem of gender discrimination was proportionate. *See id.* at 6-8.

With respect to Count II, Dr. Nanda contended that Count II of her complaint stated a claim under § 1983 because it alleged deliberate conduct for which she sought puni-

tive damages and because she sought injunctive relief which "may be granted under § 1983 without violating the Eleventh Amendment." *Id.* at 10. Finally, Dr. Nanda maintained that her allegations against Dr. Prabhakar in Count III were distinguishable from her allegations of civil rights violations made in the first two counts, and, therefore, that count should be considered independent of those violations under Illinois tort law.

## B. District Court Opinion

After considering the arguments of the parties, the district court granted in part and denied in part the University's motion. The district court acknowledged that, in several recent cases, the Supreme Court had held that Congress had encroached on the States' Eleventh Amendment immunity. However, with respect to whether Congress had abrogated properly the States' Eleventh Amendment immunity in enacting the 1972 Act, the court determined that it was not "writ[ing] on a clean slate." R.79 at 3.

The district court began its analysis by stating that "[i]n *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447 (1976), the Supreme Court concluded that in the 1972 Amendment to Title VII of the Civil Rights Act of 1964, 'Congress, acting under § 5 of the Fourteenth Amendment, authorized federal courts to award money damages . . . against a state government . . . .'" R.79 at 3. Since that time, the court continued, numerous courts of appeals had permitted Title VII claims for damages against the States. The district court specifically mentioned and followed the decision of the Eighth Circuit in *Okruhlik v. University of Arkansas ex rel. May*, 255 F.3d 615 (8th Cir. 2001). In that case, the Eighth Circuit concluded that Congress validly had abrogated the States' Eleventh Amendment immunity when it

extended Title VII to the States. The district court, "persuaded by *Okruhlik* and the authorities cited therein, conclude[d] that it may, consistent with the Constitution, exercise jurisdiction over Professor Nanda's Title VII claims." R.79 at 6. It therefore denied the University's motion to dismiss Count I.

With respect to Count II, the district court held that, by virtue of the Supreme Court's decision in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), "a lawsuit under § 1983 against state officials constitutes a suit against the State itself, and that neither a State nor its officials acting in their official capacities are 'persons' under § 1983 for purposes of damage awards." R.79 at 7. Consequently, the district court dismissed Dr. Nanda's claims for damages. However, because "the Court acknowledged in *Will* that a claim for injunctive relief may properly be brought against state officials," the district court allowed Dr. Nanda's claim for injunctive relief to go forward. *Id.*

Finally, the district court determined that Dr. Nanda's claim for intentional interference with contract contained in Count III was linked inextricably with the allegations that Dr. Prabhakar's actions were motived by sex, race and national origin. Therefore, the Illinois Human Rights Act provided the exclusive remedy for the alleged conduct and preempted Dr. Nanda's state tort claim. The court therefore granted Dr. Prabhakar's motion to dismiss Count III.

The University timely appealed the district court's denial of its motion to dismiss Counts I and II.[1]

---

[1] Dr. Nanda did not cross-appeal the district court's dismissal of Count III, and no arguments concerning Count III are before this court.

## II

## DISCUSSION

### A. Eleventh Amendment Immunity

Under 28 U.S.C. § 1291, this court has jurisdiction only from "final decisions" of the district courts. *See* 28 U.S.C. § 1291; *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 546 (7th Cir. 2001). This court has held that a district court's denial of a motion to dismiss is not a final decision. *See United States v. Michelle's Lounge*, 39 F.3d 684, 702 (7th Cir. 1994) ("Ordinarily, of course, a denial of a motion to dismiss is not a final order."). However, the collateral order doctrine provides a "narrow" exception to the finality rule. This doctrine permits an appeal from a non-final judgment, such as the denial of a motion to dismiss, when the following criteria are met: (1) the order "conclusively determine[s] a disputed question"; (2) the order "resolve[s] an important issue completely separate from the merits of the action"; and (3) the order is "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). It is well-settled that the issue of Eleventh Amendment immunity, which encompasses both immunity from liability as well as immunity from suit, is "irretrievably lost" if not immediately appealable and therefore is properly raised in a collateral appeal. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) ("We hold that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity."). Thus, we have jurisdiction to review the district court's denial of Eleventh Amendment immunity.

We review a district court's decision to dismiss a claim on Eleventh Amendment immunity grounds de novo. *See Cherry*, 265 F.3d at 547. The University urges us to reverse the district court's decision on the Eleventh Amendment issue and reiterates many of the arguments that it made in support of its motion to dismiss. Specifically, the University contends that, when the Supreme Court handed down its most recent Eleventh Amendment case, *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Court established a higher bar for congressional abrogation of the States' Eleventh Amendment immunity. In the University's view, in order to abrogate properly Eleventh Amendment immunity, a Congressional enactment must not only pass the "congruence and proportionality" test, but also must be supported by clear evidence of past constitutional violations set forth in the legislative record. The district court, continues the University, paid only lip service to this second requirement. The University contends that, because the legislative record does not reveal a pattern of past constitutional wrongs to support the extension of Title VII to the States, Title VII cannot survive an Eleventh Amendment challenge.

Dr. Nanda, and the United States as intervenor, argue the opposite. According to these parties, federal courts only have to look for a legislative record of constitutional violations if the congressional action fails the "congruence and proportionality" test. In their view, because Title VII proscribes only unconstitutional behavior, the district court did not have to examine the legislative record for a history of constitutional violations. In the alternative, Dr. Nanda and the United States maintain that, if courts have to examine the legislative record to assess the need for congressional action, there is ample evidence

in the record to justify the extension of Title VII to the States.[2]

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const.

---

[2] The United States argues that *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), disposes of the issue currently before this court. In *Fitzpatrick*, the Court determined that Congress, as part of its powers under § 5 of the Fourteenth Amendment, may "provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Id.* at 456. Although many courts, including our own, *see Merhab v. Ill. State Toll Highway Auth.*, 267 F.3d 710, 711 (7th Cir. 2001) (citing *Fitzpatrick* for proposition that "there is no Eleventh Amendment immunity to suits under Title VII"); *Love v. Waukesha Joint Sch. Dist. #1, Bd. of Educ.*, 560 F.2d 285 (7th Cir. 1977), took *Fitzpatrick* to resolve all Eleventh Amendment challenges to Title VII, the decision did hold open the possibility of an Eleventh Amendment challenge to Title VII based on Congress' authority under § 5 of the Fourteenth Amendment; it stated: "Apart from their claim that the Eleventh Amendment bars enforcement of the remedy established by Title VII in this case, respondent state officials do not contend that the substantive provisions of Title VII as applied here are not a proper exercise of congressional authority under § 5 of the Fourteenth Amendment." *Fitzpatrick*, 427 U.S. at 456 n.11. The combination of this possibility with the detailed Eleventh Amendment analysis the Court has employed in recent cases suggests to us that the most prudent course is to assume that neither *Fitzpatrick* nor our earlier summary treatment of the issue through reliance on *Fitzpatrick* necessarily disposes of the issue currently before us.

amend. XI.[3] A state's immunity, however, is not absolute; "Congress may abrogate the State's Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Garrett*, 531 U.S. at 363 (internal quotation marks and citations omitted).[4] The Supreme Court has recognized that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (internal citations omitted). Congress, therefore, "may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." *Garrett*, 531 U.S. at 364. We must ascertain, therefore, what constitutes a valid exercise of § 5 power to determine if Congress' extension of Title VII to the States falls within that grant of authority.

The Fourteenth Amendment states, in relevant part:

> Section 1. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive

---

[3] Although the text of the Amendment does not forbid suits against a State by its own citizens, "the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment." *Fed. Mar. Comm'n v. South Carolina State Ports Auth.*, 122 S. Ct. 1864, 1871 (2002). Specifically, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (citing cases).

[4] The University does not dispute that Congress unequivocally intended to abrogate the States' Eleventh Amendment immunity when it passed the 1972 Act.

any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.

. . . .

Section 5. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV. Section 5 of the Fourteenth Amendment gives to Congress the right to "enforce the substantive guarantees contained in § 1 by enacting 'appropriate legislation.'" *Garrett*, 531 U.S. at 365. This Congressional determination of necessity and propriety is "entitled to much deference." *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). Nevertheless, Congress' power is limited to enforcement; the Fourteenth Amendment does not give Congress the power "to determine what constitutes a constitutional violation," *City of Boerne*, 521 U.S. at 519, a responsibility reserved to the Court, *see Garrett*, 531 U.S. at 365.

A review of the Supreme Court's § 5 jurisprudence and our own court's implementation of these principles is helpful in drawing this distinction between enforcing and redefining the protections of the Fourteenth Amendment.

**1. Supreme Court Precedent**

Through a recent line of cases, the Court has articulated what constitutes a proper exercise of the Fourteenth Amendment enforcement power vis a vis the Eleventh Amendment. We begin our review with *City of Boerne v. Flores*.

### a. *City of Boerne*

In *City of Boerne*, the Court considered the constitutionality of the Religious Freedom Recovery Act ("RFRA"), specifically whether Congress, in enacting RFRA, properly had exercised its enforcement power under § 5 of the Fourteenth Amendment. The Court first "acknowledge[d] that § 5 is a 'positive grant of legislative power to Congress.'" *Id.* at 517 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)). "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the states.'" *Id.* at 518. However broad Congress' power under § 5, the Court continued, it is not unlimited. The Court explained that "[t]he design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at 519. Congress is limited to "enforcing" the rights guaranteed by the Amendment. *Id.* The Court recognized that

> [w]hile the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.

*Id.* at 519-20.

The Court then examined the provisions of RFRA to determine if it was a valid exercise of Congress' § 5 powers.

The parties presented RFRA as a measure to "prevent[] and remed[y] laws which are enacted with the unconstitutional object of targeting religious beliefs and practices." *Id.* at 529. The Court stated that "[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.* at 530 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). According to the Court, RFRA's legislative record lacked examples of instances in which laws of general applicability were enacted by the States for the purpose of inflicting religious discrimination. Rather, congressional hearings had focused on laws of general applicability that placed only incidental burdens on religion. The lack of a legislative record, however, was not dispositive. The Court stated that

> [r]egardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.

*Id.* at 532. Consequently, RFRA could not stand in the face of the Eleventh Amendment challenge.


### b. *Florida Prepaid*

The Court next addressed the interplay of the Eleventh and Fourteenth Amendments in *Florida Prepaid Post Secondary Education Examination Board v. College Savings Bank*, 527 U.S. 627 (1999). In that case, the Court addressed an Eleventh Amendment challenge to the Patent and Plant Variety Protection Remedy Clarification Act (the "Patent Remedy Act"), which allowed patent holders to pursue

infringement actions against the States. In assessing the validity of the congressional action, the Court reiterated the requirements of congruence and proportionality established in *City of Boerne*:

> We . . . held that for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct.
>
> RFRA failed to meet this test because there was little support in the record for the concerns that animated the law.

*Id.* at 639.

Following this course, the Court first identified the Fourteenth Amendment "evil" or "wrong" that Congress intended to remedy " 'with reference to the historical experience . . . it reflects.' " *Id.* at 639-40 (quoting *City of Boerne*, 521 U.S. at 525). In *Florida Prepaid*, as in *City of Boerne*, the Court was unable to identify a pattern of constitutional wrongs by the States against patent holders. The Court went on to state that, although the "lack of support in the legislative record is not determinative," *id.* at 646, identifying and assessing "the wrong or evil is still a critical part of our § 5 calculus because '[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one,' " *id.* (quoting *City of Boerne*, 521 U.S. at 530). When there is little evidence of constitutional harm in the legislative record, the means of combatting the feared unconstitutional action must be tailored to address clear constitutional violations. Because the Patent Remedy Act offended this principle of proportionality, the Court held that it was not a valid exercise of Congress' § 5 powers.

### c. *Kimel*

The Age Discrimination in Employment Act was the next Congressional enactment to meet with an Eleventh Amendment challenge. In *Kimel v. Florida Board of Regents,* 528 U.S. 62 (2000), the Court addressed the issue of whether Congress validly abrogated Eleventh Amendment immunity in the ADEA. The Court reiterated the breadth of congressional power pursuant to the Fourteenth Amendment: "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Id.* at 81. However, applying its now-established congruence and proportionality requirements, *see id.* at 82, the Court held that "the ADEA is not 'appropriate legislation' under § 5 of the Fourteenth Amendment." *Id.* at 82-83. Initially, the Court observed that, because age discrimination is subject only to rational basis review under the Equal Protection Clause, only irrational age classifications violate the Constitution. "Judged against the backdrop of our equal protection jurisprudence [on age discrimination]," the Court stated, "it is clear that the ADEA is 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent unconstitutional behavior.' " *Id.* at 86 (quoting *City of Boerne,* 521 U.S. at 532). However, "[t]hat the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, d[id] not alone provide the answer to [the] § 5 inquiry." *Id.* at 88. The Court's task was to discern whether the ADEA was proper prophylactic legislation or an attempt by Congress "to substantively redefine the States' legal obligations with respect to age discrimination," and one means to make such a determination was to examine the legislative record. *Id.* To the Court, this review con-

firmed that Congress' extension of the ADEA to the States "was an unwarranted response to a perhaps inconsequential problem." *Id.* at 89. According to the Court,

> Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation. The evidence compiled by petitioners to demonstrate such attention by Congress to age discrimination by the States falls well short of the mark. That evidence consists almost entirely of isolated sentences clipped from floor debates and legislative reports.

*Id.* Looking back to its decision in *City of Boerne*, the Court held that, although this lack of support in the legislative record was not determinative, "Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field." *Id.* at 91. The Court then concluded that, "[i]n light of the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States, we hold that the ADEA is not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment." *Id.*

### d. *Garrett*

Finally, in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Court considered an Eleventh Amendment challenge to the Americans with Disabilities Act ("ADA"). Again, the Court's task was to determine whether the ADA was proper enforcement legislation, as opposed to a usurpation of the Court's responsibility "to define the substance of constitutional guaran-

tees." *Id.* at 365. "Accordingly," stated the Court, "§ 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* (quoting *City of Boerne*, 521 U.S. at 520). The Court's first step in this analysis was to identify the scope of the constitutional right at issue. It noted that the Equal Protection clause affords only rational basis review for disability discrimination. Once the Court determined "the metes and bounds of the constitutional right in question, [it] examine[d] whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled." *Id.* at 368. It noted that "Congress' § 5 authority is appropriately exercised only in response to state transgressions." *Id.* However, the legislative record of the ADA, the Court noted, focused heavily on the private sector. Few examples from the record involved the States, and the Court found it "debatable" whether these incidents evidenced "irrational" state action or merely "an unwillingness on the part of state officials to make the sort of accommodations for the disabled required by the ADA." *Id.* at 370. However, the Court held that, even if each incident showed unconstitutional action on the part of the State, "these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based," *id.*, and thus the ADA "raise[d] the same sort of concerns as to congruence and proportionality as were found in *City of Boerne*," *id.* at 372. "[I]n order to authorize private individuals to recover money damages against the States," the Court stated, "there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation." *Id.* at 374. With respect to the ADA, those requirements had not been met. *See id.*

Although articulated and ordered slightly differently within each case, we believe that these cases identify several guiding principles that must inform our Eleventh Amendment analysis. First, congressional action taken pursuant to § 5 of the Fourteenth Amendment is not limited to parroting the language of § 1. Section 5 is a positive grant of power, and Congress may enact reasonable prophylactic legislation in the face of constitutional violations.

However, Congress' enforcement power must stop short of redefining the States' substantive obligations under the Fourteenth Amendment. Whether a particular congressional response enforces, as opposed to defines, the States' obligations under § 1 of the Fourteenth Amendment is determined by looking at the scope of the enactment compared with the constitutional right being protected. If the scope of the remedy is broad, it must be justified by a proportionately pressing need. Finally, although legislative history is not determinative of this inquiry, it is one means—and perhaps the most telling means—of assessing the depth of the constitutional problem and the consequent need for a congressional remedy.

### 2. Circuit Precedent

This court has applied the principles set forth above in considering two Eleventh Amendment challenges to the Equal Pay Act. In *Varner v. Illinois State University*, 226 F.3d 927 (7th Cir. 2000), *cert. denied*, 533 U.S. 902 (2001), this court followed the analysis set forth by the Supreme Court in *City of Boerne* and its progeny, and first looked at the conduct targeted by the Equal Pay Act. We acknowledged that, in light of the burden-shifting provisions of the Equal Pay Act, "an employer is potentially subject to liability without a showing of discriminatory intent"—a

prerequisite for a constitutional violation. *Id.* at 932. However, we noted, based on the Court's rulings, the fact that the Equal Pay Act prohibited some constitutional conduct did not end the inquiry: "The question before us, therefore, is not whether the remedial provisions of the Equal Pay Act prohibit some constitutional conduct. Instead, we must consider whether the Act can be characterized as a proportional and congruent response to the problem of unconstitutional wage discrimination based on gender." *Id.* at 933.

In applying the principles of congruence and proportionality, we noted three distinctions between the Equal Pay Act and the legislative provisions that the Court had struck down. First, the Equal Pay Act was "less indiscriminate in scope" than those acts, *id.*; it contained exemptions from liability for employers "who can provide a neutral explanation for a disparity in pay," *id.* at 934. Furthermore, the Equal Pay Act addressed a problem—gender discrimination—which was subject to heightened scrutiny under the Constitution. Finally, Congress had gained an historical understanding of the problem of gender discrimination through other legislation. All of these considerations militated against a finding that Congress had acted to redefine the States' obligations under the Equal Protection Clause as opposed to simply enforcing the already stringent requirements on the States.

In upholding the Equal Pay Act against the Eleventh Amendment challenge, we rejected the view that explicit legislative findings were a necessary element of the § 5 inquiry. In *Varner*, the University had urged that, because "the legislative findings underlying the Equal Pay Act address only the problem of discrimination in private industry," there was no record to justify extension of the Equal Pay Act to public employers. *Id.* at 935. We stated:

> Although we recognize that a review of the legislative record can be an instructive means of distinguishing appropriate remedial action from an impermissible substantive change in legal rights, we want to emphasize that a "lack of support [in the legislative record] is not determinative of the § 5 inquiry." This observation is particularly relevant in the context of the Equal Pay Act, where the value of congressional findings is greatly diminished by the fact that the Act prohibits very little constitutional conduct and where the historical record clearly demonstrates that gender discrimination is a problem that is national in scope.

*Id.* (quoting *Kimel,* 528 U.S. at 91; internal citations omitted). Consequently, we determined that subjecting state entities to liability under the Equal Pay Act did not violate the Eleventh Amendment.

Shortly thereafter, we revisited our decision in *Varner* in light of the Supreme Court's decision in *Garrett. See Cherry v. Univ. of Wis. Sys. Bd. of Regents,* 265 F.3d 541 (7th Cir. 2001). We restated the governing standard as follows:

> Congress can enact legislation to remedy or prevent conduct that violates the Fourteenth Amendment, but Congress cannot redefine or expand the substance of the Fourteenth Amendment itself. Thus there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. This means that Congress must carefully tailor its legislation so that it enforces the Fourteenth Amendment without altering the Amendment's meaning.

*Id.* at 549 (internal quotation marks and citations omitted). We then examined the scope of the Equal Pay Act to determine whether it was consistent and compatible with

the Fourteenth Amendment or whether it expanded the substantive prohibitions of the Amendment by prohibiting more state action than would be unconstitutional. As part of this analysis, we examined the legislative record to assess whether Congress had identified a pattern of unconstitutional conduct by the States. Noting that the Court had advised that this evidence "is not determinative of the § 5 inquiry," we stated that "[s]uch evidence tends to ensure that Congress' means are appropriate under § 5 when the statute in question pervasively prohibits constitutional State action." *Id.* at 549 (internal quotation marks and citations omitted). We dismissed the argument that *Garrett*

> established a new, bright-line rule that Congress' attempt to abrogate immunity from a federal statute is invalid if the statute lacks specific findings that the States had engaged in a pattern of unconstitutional conduct of the type prohibited by the statute. . . . All *Garrett* does is further demonstrate that the legislative record is an important factor when the statute in question pervasively prohibits constitutional State action.

*Id.* at 553. Consequently, again we sustained the Equal Pay Act as it applied to the States.

### 3. Application

As detailed above, in determining whether Congress overstepped its constitutional authority in applying Title VII to the States, we must "identify with some precision the scope of the constitutional right at issue," here the limitations that § 1 of the Fourteenth Amendment places upon States' treatment of women and of ethnic and racial minori-

ties. *Garrett*, 531 U.S. at 365. We explained this level of protection in *Varner*:

> Under the Constitution, gender-based classifications are afforded heightened scrutiny. Once an individual is able to establish the existence of a gender-based distinction, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."

226 F.3d at 934 (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996); internal citations omitted).[5] In the employment context, courts have given effect to this constitutional prohibition by allowing plaintiffs to prove their case using the familiar construct of a prima facie case; this court has stated:

> Although as an original matter it seems odd that the pleading and proof of liability in a case under the Constitution would be the same as in a case under a statute passed in 1964, this is indeed the teaching of an unbroken phalanx of decisions by this and other courts. These cases hold that the issue of liability and the method of proving liability are the same, though only in a disparate-treatment case . . . .

*Riordan v. Kempiners*, 831 F.2d 690, 695-96 (7th Cir. 1987). Thus, "all that is required to establish prima facie liability, and thus allow the plaintiff to get to the jury, is evidence

---

[5] Racial classifications are subject to strict scrutiny—they must promote a compelling state interest and be narrowly tailored to serve that interest. *See Billings v. Madison Met. Sch. Dist.*, 259 F.3d 807, 815 (7th Cir. 2001).

of a disparity in treatment[6] between equally qualified workers of different sexes, from which discriminatory intent can be inferred." *Id.* at 695; *see also Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988) ("A plaintiff proceeding on a disparate treatment theory of employment discrimination must show disparate treatment and discriminatory motive. A plaintiff can establish a prima facie case, however, by producing evidence of disparate treatment alone." (internal citations omitted)).

The Supreme Court also has instructed us to evaluate the scope of the congressional action at issue to determine to what extent, if any, the act prohibits conduct allowed by the Constitution. At issue here is the disparate treatment prohibition of Title VII. It states in relevant part:

> It shall be an unlawful employment practice for an employer—
>
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

---

[6] The allegations in Dr. Nanda's complaint are limited to claims of intentional discrimination, i.e., disparate treatment. Because Dr. Nanda's claims are disparate treatment claims, and because the University does not contend that Title VII's disparate impact provisions should factor into the Eleventh Amendment calculus, we limit our review to Title VII's disparate treatment provisions. *Cf. In re: Employment Discrimination Litig. Against the State of Ala.*, 198 F.3d 1305 (11th Cir. 1999) (considering Eleventh Amendment challenge to disparate impact provision of Title VII without consideration of the disparate treatment provision).

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a). Like the prohibition of the Equal Protection Clause, this language is aimed at intentional discrimination, and "[t]o prove a violation of this provision, a plaintiff must proffer either direct or indirect evidence of the employer's discriminatory intent." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). When using the indirect method, the plaintiff establishes a prima facie case of discriminatory intent by showing: (1) that she belongs to a protected category; (2) that she suffered an adverse employment action; (3) that she was meeting her employer's legitimate expectations; and (4) similarly situated individuals not in a protected category were treated more favorably by the employer. *See, e.g., Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 752 (7th Cir. 2000). Thus, both the aim of Title VII, as well as the method for proving violations of Title VII, are the same as those of the Equal Protection Clause.[7]

---

[7] Both Dr. Nanda and the Government argue that Title VII does not prohibit any constitutional conduct because the burdens of proof on employers is the same under both the Equal Protection Clause and Title VII. The University responds to this argument accordingly:

> The substantive provisions of Title VII were enacted *in 1964*, not in 1972, and the States at that time were expressly excluded from coverage because of sovereign immunity. If
> (continued...)

   A review of the standards of the Equal Protection Clause
and of Title VII reveals that Title VII "enforces the Four-
teenth Amendment without altering its meaning." *Cherry*,
265 F.3d at 549. The fact that Congress was not attempt-
ing to "redefine" the Fourteenth Amendment in extend-
ing Title VII to the States is also clear from the legislative
record. In undertaking a review of the legislative record,
we are cognizant of the Court's instruction that "lack of
support [in the legislative record] is not determinative of
the § 5 inquiry," *Kimel*, 528 U.S. at 91, and we recognize
that "the value of congressional findings is greatly dimin-
ished" by the fact that the disparate treatment provisions
of Title VII prohibit little, if any, constitutional conduct,
*Varner*, 226 F.3d at 935.

---

[7] (...continued)

      the court were to accept the argument of Nanda and the
      United States, the court would be required to conclude
      that since, *in 1964*, the Title VII protections were identi-
      cal to the protections of § 1 of the Fourteenth Amendment
      they were at that time, by definition, congruent and propor-
      tional and that, abrogation, without more, occurred. The
      court would then have to conclude that *in 1964*, Congress,
      when it enacted Title VII, abrogated the States' immunity
      and *at the same time* expressly excluded the States from Title
      VII's coverage, an absurd conclusion.

Reply Br. at 1-2. This response, we believe, lacks both logic and
persuasiveness. The substantive provisions of Title VII did not
change between 1964 and 1972; the 1972 amendment mere-
ly extended Title VII to the States. It is perfectly appropriate,
therefore, in applying principles of congruence and proportional-
ity, to compare the substantive provisions of Title VII, as ex-
tended to the States in 1972, to the limitations placed on the
States by the Equal Protection Clause.

In the present case, the legislative record confirms that Congress was responding to a pattern of discrimination by the States. The legislative history shows that Congress relied upon and adopted two comprehensive studies of racial and national origin discrimination to support its proposed legislation. *See* H.R. Rep. No. 92-238, at 17 (1971). The first of these "indicate[d] that widespread discrimination against minorities exist[ed] in State and local government employment . . . ." *Id.* The legislative record also specifically addresses the problem of racial and gender discrimination in academia. *See id.* at 19-20. Finally, statistical evidence bolstered Congress' view that "there exist[ed] a profound economic discrimination against women workers" across all fields, and, consequently, legislation was needed to strengthen and broaden federal administrative procedures for combatting this discrimination. *Id.* at 4.

Not only did Congress document the need for additional legislation protecting minority and women workers employed by the states, local governments, and specifically educational institutions, Congress had become familiar with the problems of race and national origin discrimination in the public and private sector in enacting the Civil Rights Act of 1964, and with the problems of gender discrimination in considering the Equal Rights Amendment and the Educational Opportunity Act, *see Okruhlik v. Univ. of Ark. ex rel. May*, 255 F.3d 615, 625 (8th Cir. 2001). Such familiarity " 'reduce[s] the need for fresh hearings and prolonged debates.' " *Id.* (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 503 (1980) (Powell, J., concurring)). As we concluded in *Varner*, "[w]e believe that this evidence is sufficient to support the limited action taken by Congress in its passage of [the 1972 Act], particularly given the well-documented history of gender [and race] discrimination in this Nation, a history that is embodied in the Su-

preme Court's own jurisprudence." *Varner*, 226 F.3d at 935-36.

We are not alone in concluding that Congress validly abrogated the States' Eleventh Amendment immunity in passing the 1972 Act. In *Okruhlik*, the Eighth Circuit also rejected an Eleventh Amendment challenge to Title VII. Following the guidelines of the Supreme Court, that circuit looked at the legislative history where it found "much support" for Congress' action. *Okruhlik*, 255 F.3d at 624. As well, it compared the scope of the employer's responsibility under Title VII to its responsibility under the Equal Protection Clause and noted that "the elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution." *Id.* at 626. Any differences between the two protections, either by way of remedies or scope,[8] were "proportional and congruent" responses to a pattern of unconstitutional state action. *Id.*

Because the disparate treatment provision of Title VII prohibits little if any constitutional behavior and because Congress was acting on a solid evidentiary ground in extending Title VII to the States, we hold that the 1972 Act validly abrogated the States' Eleventh Amendment immunity with respect to Title VII disparate treatment claims.

## B. Prayer for Injunctive Relief in Count II

The University also challenges the district court's failure to dismiss Dr. Nanda's claims for injunctive relief pursuant

---

[8] The Eighth Circuit considered the effect of Title VII's disparate impact provisions as well as Title VII's disparate treatment provision. *See Okruhlik v. Univ. of Ark. ex rel. May*, 255 F.3d 615, 626 (8th Cir. 2001).

to 42 U.S.C. § 1983. The University and its officials contend that the district court erred when it let stand Dr. Nanda's request in Count II for injunctive relief against the University officials in their official capacities. Because the requested relief of reinstatement can be granted only by the University acting through its trustees, the defendants contend that this request is appropriately characterized as a request for injunctive relief against the University. The University, they continue, is protected by the Eleventh Amendment from such relief. Before we address the merits of this claim, we must first consider whether we have jurisdiction to entertain this aspect of the appeal.[9]

We believe that we have jurisdiction over this contention for the same reason that we have jurisdiction over the earlier contention concerning the applicability of the Eleventh Amendment to a suit under Title VII. In essence, the defendants are claiming that the Eleventh Amendment provides them with a shield from litigating this claim. This situation therefore is different from the situation in *Cherry* in which we held that a claim of immunity from punitive damages under Title IX was not the equivalent of a claim of immunity from litigation. *See Cherry*, 265 F.3d at 547. As our citations to *Burns-Vidlak v. Chandler*, 165 F.3d 1257, 1260 (9th Cir. 1999), and to *Pullman Construction Industries, Inc. v. United States*, 23 F.3d 1166, 1169 (7th Cir. 1994), confirm, in *Cherry* we were

---

[9] Dr. Nanda did not argue that this court lacked jurisdiction to entertain the University's appeal on this issue; however, this court must assure itself of its own jurisdiction regardless of whether the issue was raised by a party. *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 660 (7th Cir. 1999) ("A court of appeals has an obligation to examine its jurisdiction sua sponte, even if the parties fail to raise a jurisdictional issue.").

speaking of a claim of immunity not based on the Eleventh Amendment.

We agree with the district court that, under § 1983, a suit against state officials in their official capacity limited to injunctive relief is not barred by the Eleventh Amendment. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). Whether such relief is warranted and whether it is warranted against these defendants are matters not properly before us on this interlocutory appeal.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*